**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**NAKALA MURRY, INDIVIDUALLY AND
ON BEHALF OF HER SON, A.M., A MINOR**                    **PLAINTIFF**

**v.**                                  **CIVIL ACTION NO.: 4:23CV97-DMB-DAS**

**CITY OF INDIANOLA, MISSISSIPPI; CHIEF
RONALD SAMPSON, In His Individual and
Official Capacity; OFFICER GREG CAPERS,
In His Individual and Official Capacity; and,
JOHN DOES 1-5, In Their Individual and
Official Capacities**                             **DEFENDANTS**

<u>**OFFICER GREG CAPERS' MEMORANDUM OF AUTHORITIES IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS, OR ALTERNATIVELY, FOR
SUMMARY JUDGMENT AS TO PLAINTIFF'S FEDERAL CLAIMS**</u>

**NOW COMES** Defendant, Officer Greg Capers, in his Individual and Official Capacities,

by and through counsel, and respectfully files this, his Memorandum of Authorities in Support of

Motion for Judgment on the Pleadings or Alternatively, for Summary Judgment, as to Plaintiff's

Federal Claims, to-wit:

**I. PREMISE**

In the Complaint, Plaintiff brings federal law claims against Defendant Officer Greg Capers,

in his Individual and Official Capacities, under 42 U.S.C. § 1983 predicated on alleged Fourth and

Fourteenth Amendment violations. Foremost, under federal law, Plaintiff's official capacity claims

against Officer Capers are merely duplicative of Plaintiff's claims against the City of Indianola and

should be dismissed. Additionally, all of Plaintiff's federal claims should be dismissed under Rule

12(c) because Plaintiff's allegations amount to no more than an unintentional shooting where an

officer reasonably reacted to a potentially dangerous situation and threat of serious harm, which does

1

not constitute a constitutional violation under clearly established law. Accordingly, as Plaintiff's allegations do not rise to the level of any constitutional violation and any actions taken by Officer Capers were objectively reasonable in light of clearly established law, Officer Capers is entitled to qualified immunity, and Plaintiff's federal claims must fail. Dismissal is warranted under Rule 12(c) of the *Federal Rules of Civil Procedure.*

## II.   FACTS

According to the Complaint, on or about May 20, 2023, around 4:00 a.m., Plaintiff Murry "received an unexpected visit from an irate father of one of her minor children" while she was at home with her two minor children and her minor nephews.[1] Plaintiff alleges in her Complaint that Plaintiff Murry, fearing for her and the children's safety, instructed her son, Plaintiff A.M., to call the police.[2] Thereafter, Officer Capers responded to the scene.[3] Next, according to the Complaint, Officer Capers asked that everyone inside the residence come outside.[4] Plaintiff then alleges that as "Plaintiff A.M. was coming around the corner of the hallway that lead into the living room area, he was instantly shot by Defendant Officer Capers[,]" incurring injuries as a result.[5]

The specific facts of the incident are clarified in Defendants' Answer and the exhibits attached thereto. On Saturday, May 20, 2023, around 4:41 a.m., Officer Webb and Officer Capers received a call from dispatch in regards to a 911 call for a violent domestic disturbance at the

---

[1] Compl. **[Doc. 1]** at ¶ 10.

[2] *Id.* at ¶ 11.

[3] *Id.* at ¶ 12.

[4] *Id.* at ¶ 13.

[5] *Id.* at ¶¶ 14, 16, & 17.

Plaintiff's address involving Nakala Murry and John Nolden.[6]  Dispatch advised the Officers that the 911 caller had advised that her daughter's boyfriend had jumped her and assaulted her.[7]  At no point were the officers informed that children were present at the scene.[8]

Though the IPD officers did not know children were present, they were aware that the Plaintiff's address had been the scene for dozens of violent, and sometimes armed, disputes between Plaintiff Nakala Murry and John Nolden.[9]  Indeed, IPD officers had been called out to the Plaintiff's residence at least fourteen (14) times in the five years preceding the subject incident.[10]  In fact, Officer Capers had previously responded to a 911 call at this address for domestic violence.[11] The suspect, John Nolden, had been arrested numerous times for domestic violence, assault, and other violent offenses.[12]

Upon their arrival, the officers noticed that the windows to the residence had blackout screens

---

[6] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 3; Answer **[Doc. 19]**, at 1.

[7] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 2; **[Doc. 31-8]** Exhibit "H," Call Reports for 1111 BB King (BS 58-71), at 13; Answer **[Doc. 19]** at 1.

[8] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 3; Answer **[Doc. 19]** at 1, & 3-4.

[9] **[Doc. 31-3]** Exhibit "C," Arrests Reports and Call Log (BS 29-33), at 3; **[Doc. 31-8]** Exhibit "H," Call Reports for 1111 BB King (BS 58-71); **[Doc. 31-12]** Exhibit "L," Prior IPD Incident Reports (BS 34-57), at 7, 16-17, 20-21, & 22-23 (disputes involving Ms. Murry and/or Mr. Nolden where a gun was used); Answer **[Doc. 19]** at 1 & 3-4.

[10] **[Doc. 31-3]** Exhibit "C," Arrests Reports and Call Log (BS 29-33), at pg. 3; **[Doc. 31-8]** Exhibit "H," Call Reports for 1111 BB King (BS 58-71); **[Doc. 31-12]** Exhibit "L," Prior IPD Incident Reports (BS 34-57), at  11-12, 13, 14-15, & 20-21; Answer **[Doc. 19]** at 1.

[11] **[Doc. 31-4]** Exhibit "D," IPD Incident Report for 11-7-20 (BS 81-83); Answer **[Doc. 19]** at 1-2.

[12] **[Doc. 31-9]** Exhibit "I," IPD Arrest Reports Nolden (BS 19-28); **[Doc. 31-10]** Exhibit "J," IPD Municipal Court Abstracts Nolden (BS 15-18); Answer **[Doc. 19]** at 2.

preventing them from seeing inside.[13] Officer Capers radioed dispatch and asked who the 911 caller

was, and dispatch responded the caller was Nakala Murry.[14] Officer Capers approached the front

door and knocked multiple times.[15] Receiving no response, Officer Capers noted that something was

not right and began checking the exterior of the darkened house.[16] While doing so, Officer Capers

maintained communications with dispatch, requesting that dispatch get the caller back on the line

and inform her that the officers were outside.[17] Upon communication with the caller, dispatch relayed

Ms. Murry's statements that she heard the officers at the door and that the suspect would not allow

her to answer the door.[18] Officer Capers asked if they had permission to kick in the door, to which

dispatch responded, upon communication with the caller, that Ms. Murry gave them consent to kick

it in.[19] Dispatch also informed the officers that Ms. Murry stated she did not know if the suspect was

armed.[20] Ms. Murry could be heard screaming from within the residence, yelling "let me go!"[21] At

---

[13] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; Answer **[Doc. 19]** at 2.

[14] **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:00:50-0:00:59); Answer **[Doc. 19]** at 2.

[15] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:01:03, 0:01:22, 0:01:50, 0:02:49, & 0:03:05; Answer **[Doc. 19]** at 2.

[16] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:01:50, 0:02:03 (Officer Capers stating, "Something ain't right."), 0:02:49, & 0:03:05; Answer **[Doc. 19]** at 2.

[17] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:01:34; Answer **[Doc. 19]** at 2.

[18] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:02:25; Answer **[Doc. 19]** at 2.

[19] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:02:42 & 0:03:22; Answer **[Doc. 19]** at 2.

[20] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; Answer **[Doc. 19]** at 2.

[21] **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:03:34; Answer **[Doc. 19]** at 2.

that time, Officer Webb and Officer Capers drew their firearms.[22]

After multiple failed attempts to kick in the door, Ms. Murry opened it.[23] Officer Capers asked Ms Murry where the suspect was located.[24] Ms Murry responded with a non-verbal gesture by nodding her head and rolling her eyes at the interior of the residence towards the room on the left behind her.[25] Officer Webb told Ms. Murry to step outside and away from the door.[26] Ms. Murry then stated that the suspect was in the back room.[27] Next, Officer Capers stepped onto the threshold of the house with his flashlight providing the only light inside the residence.[28] Officer Capers and Officer Webb yelled "police" and ordered the suspect to come out multiple times.[29]

Suddenly, a male in a red shirt ran directly towards Officer Capers from the room where Ms. Murry stated that the suspect was located.[30] Officer Capers discharged his firearm, striking the

---

[22] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:03:37; Answer **[Doc. 19]** at 2.

[23] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:03:39; Answer **[Doc. 19]** at 2.

[24] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:03:41; Answer **[Doc. 19]** at 2.

[25] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:03:42; Answer **[Doc. 19]** at 2.

[26] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:03:43; Answer **[Doc. 19]** at 2.

[27] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; Answer **[Doc. 19]** at 2.

[28] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:03; Answer **[Doc. 19]** at 2.

[29] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:03:45, 0:03:48, 0:03:51, 0:03:54, & 0:04:03; Answer **[Doc. 19]** at 2.

[30] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:05; Answer **[Doc. 19]** at 2-3.

individual charging towards him.[31] Moments later, Officer Capers learned for the first time that the individual in the red shirt appeared to be a child and exclaimed "Oh my God" as he helped the child exit the house.[32] This individual continued to run to the side of the road.[33] Both Officer Capers and Officer Webb immediately requested that dispatch send Med-Stat to the location, with Officer Capers stating "Med-Stat! Med-Stat! Med-Stat! Med-Stat! Med-Stat! We need them now!"[34] Both officers immediately ran to render aid to this individual, who they then learned for the first time was Ms. Murry's minor child, A.M.[35] The suspect, John Nolden, then exited the house and was placed in handcuffs.[36] Nolden was arrested for domestic violence at the scene.[37] Officer Capers was visibly upset about the entire unexpected ordeal.[38]

Thereafter, on May 22, 2023, Plaintiff Nakala Murry caused a notice of claim letter to be sent to the City of Indianola and Chief Sampson alleging "injuries and damages sustained on May 22,

---

[31] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:06; Answer **[Doc. 19]** at 2-3.

[32] **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:07-0:04:10; Answer **[Doc. 19]** at 3.

[33] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:10-0:04:18; Answer **[Doc. 19]** at 3.

[34] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at  pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:12-0:04:19; Answer **[Doc. 19]** at 3.

[35] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:20; Answer **[Doc. 19]** at 3.

[36] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:41;  Answer **[Doc. 19]** at 3.

[37] Exhibit "K," IPD Docs (BS 3-10), Exhibit "A," to Motion to Stay **[Doc. 20]**, at 2; Answer **[Doc. 19]** at 3.

[38] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75) at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:20- 0:04:51 (repeating "Oh my God" and calling for Med-Stat); Answer **[Doc. 19]** at 1-4.

2023."[39] On May 25, 2023, Ms. Murry pressed charges against John Nolden for simple assault related to the subject incident due to him threatening to kill her that evening.[40] On May 30, 2023, Plaintiff Murry filed her Complaint in the instant matter, asserting a number of claims under state and federal law against the City of Indianola, Chief Sampson, in his Individual and Official Capacities, and Officer Capers, in his Individual and Official Capacities.[41] Then, on June 5, 2023, Plaintiff Murry also pressed charges against Officer Capers for the subject incident.[42]

### III. STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." The standard for addressing a motion for judgment on the pleadings under Rule 12(c) is the same as that for addressing a motion to dismiss under Rule 12(b)(6).[43] Thus, to survive Defendants' Motion, Plaintiff's Complaint must provide the grounds for entitlement to relief—including factual allegations that when assumed to be true "raise a right to relief above the speculative level."[44] The Complaint must allege "sufficient factual matter…to state a claim that is plausible on its face."[45] "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable

---

[39] **[Doc. 31-1]** Exhibit "A," Notice of Claim Letter, Exhibit "A," to Answer **[Doc. 19-1],** at 1.

[40] **[Doc. 31-11]** Exhibit "K," IPD Docs (BS 3-10), **[Doc. 31-1]** Exhibit "A," to Motion to Stay **[Doc. 20]**, at 2; Answer **[Doc. 19]** at 3.

[41] Compl. **[Doc. 1].**

[42] **[Doc. 31-2]** Exhibit "B," to Motion to Stay **[Doc. 20-2]**, General Criminal Affidavit on Capers, at 1.

[43] *In re Great Lakes Dredge & Dock Co.,* 624 F.3d 201, 209–10 (5th Cir. 2010).

[44] *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007)(quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 553-56 (2007)).

[45] *Thombly*, 550 U.S. at 570.

inference that the defendant is liable for the misconduct alleged."[46] A court should not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," which "do not permit the court to infer more than the mere possibility of misconduct."[47]

Under Rule 12(c), like Rule 12(b)(6), the central question is whether the Complaint includes claims that are plausible.[48] Accordingly, the legal claims identified in the Complaint must be compared with the factual allegations offered in support, including any exhibits attached to the Complaint and Answer.[49] "In considering a motion for judgment on the pleadings under Rule 12(c), the court is generally limited to the contents of the pleadings, including attachments thereto. The 'pleadings' include the complaint [and] answer to the complaint[.]"[50]

As all of Plaintiff's allegations against Defendants are based upon the force that was used in responding to a 911 call and effectuating the related arrest on May 20, 2023, this Court "must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[51] As provided by the Fifth Circuit, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record."[52] "When documents of public record reveal that a plaintiff's complaint is not plausible, a court is not required to consider a motion

---

[46] *Id*. at 556.

[47] *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949-50 (2009).

[48] *Twombly,* 550 U.S. at 555.

[49] *Olivier v. City of Brandon*, No. 3:21-cv-00636-HTW-LGI, 2022 U.S. Dist. LEXIS 196233, at *19-20 (S.D. Miss. Sep. 23, 2022) (citing *Iqbal*, 556 U.S. at 678).

[50] *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015).

[51] *Jackson v. City of Hearne*, 959 F.3d 194, 205 (5th Cir. 2020) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)).

[52] *Hall v. Hodgkins*, 305 F. App'x 224, 227 (5th Cir. 2008) (per curiam) quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007)).

to dismiss as one for summary judgment."[53] Both the incident reports related to the subject 911 call and related arrest reports as well as similar prior incident reports, arrest reports, and court abstracts involving the same parties to the instant incident are the central to the allegations of Plaintiff's Complaint and are matters of public record[54] proper for consideration on the instant motion that clearly reflect that Plaintiff fails to state a plausible claim.[55]

Moreover, the body camera footage from May 20, 2023, is central to Plaintiff's Complaint and is proper for consideration on a motion to dismiss or motion for judgment on the pleadings.[56] Because video evidence is available, Fifth Circuit jurisprudence requires this Court to "view the facts in the light depicted by the videotape."[57] "In such an instance, the court is not required to favor plaintiff's allegations over the video evidence."[58] Instead, where the video contradicts Plaintiff's

---

[53] *Martin v. Rainbow Casino*, No. 5:11-CV-142 DCB RHW, 2012 WL 1883673, at *1 (S.D. Miss. May 22, 2012)(quoting *Papasan v. Allain*, 478 U.S. 265, 269 n. 1 (1986)).

[54] The Complaint refers to the 911 due to Nolden's criminal conduct towards Ms. Murry, which incorporates any documents related to such. Incident reports, arrest reports, and 911 call recordings are matters of public record as defined by *Miss. Code Ann*. § 25-61-3(b)&(e) and are not excluded from public disclosure by *Miss. Code Ann*. § 25-61-12(c).

[55] *Armstrong v. Ashley*, 60 F.4th 262, 272 n.10 (5th Cir. 2023) (citing *Scanlan v. Texas A&M Univ*., 343 F.3d 533, 536 (5th Cir. 2003) (police report was proper for consideration on Rule 12(c) Motion); *Wright v. Moore*, No. 3:20-CV-473-DPJ-FKB, 2021 U.S. Dist. LEXIS 174049, at *17-18 (S.D. Miss. Sep. 14, 2021) (citing *Johnson-Williams v. Citimortgage, Inc*., 750 F. App'x 301, 304 (5th Cir. 2018) (arrest records were proper for consideration on Rule 12(c) Motion).

[56] *See e.g., Beroid v. Lafleur*, No. 22-30489, 2023 U.S. App. LEXIS 9644, at *11 (5th Cir. Apr. 21, 2023) (per curiam) (quoting *Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017) (per curiam); citing *Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir. 2021)).

[57] *Boyd v. McNamara*, 74 F.4th 662, 665-66 (5th Cir. 2023) (quoting *Salazar v. Molina*, 37 F.4th 278, 280 (5th Cir. 2022) (alteration omitted)).

[58] *Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017) (per curiam) (citing *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)).

version of the incident, courts credit the facts evidenced on video.[59] Indeed, "a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings."[60] Likewise, as the 911 call is referenced in and central to Plaintiff's Complaint, it too may be properly considered for the instant motion.[61] Regardless, this Court may consider matters outside the pleadings and render summary judgment in the alternative.[62]

## IV. ARGUMENT

Section 1983 is the procedural avenue Plaintiffs must take to pursue constitutional violations, and the governing legal standards are well settled.[63] Plaintiff asserts the following federal claims in the Complaint under 42 U.S.C. § 1983: (1) Fourth and Fourteenth Amendment violations; and (2) Fourth Amendment excessive force.[64] All of Plaintiff's federal claims must fail.

### A.    Plaintiff's Official Capacity Claims Against Officer Capers are Duplicative

First, Plaintiff's official capacity claims against Defendant Officer Capers are merely duplicative of Plaintiff's claims against the City of Indianola and should be dismissed. Under federal

---

[59] *See e.g., Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022) (quoting *Scott*, 550 U.S. at 380-81); *Brothers v. Zoss*, 837 F.3d 513, 517 (5th Cir. 2016) (quoting *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012)).

[60] *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2519, 209 L. Ed. 2d 551 (2021) (quoting *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017)).

[61] *Beroid*, 2023 U.S. App. LEXIS 9644, at *11-12 (citing *Tucker*, 998 F.3d at 170 (internal quotation marks and citation omitted)).

[62] *See e.g., Bosarge,* 796 F.3d at 440; *Galvan v. Calhoun Cty.,* 719 F. App'x 372, 375 (5th Cir. 2018) (per curiam) (citing *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.,* 748 F.3d 631, 635 (5th Cir. 2014)); *St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 279 (5th Cir. 1991).

[63] *Escamilla v. Elliot*, 816 F. App'x 919, 922-25 (5th Cir. 2020).

[64] **[Doc. 1]** at ¶¶ 21-25.

law, suit against an officer in his official capacity is the same thing as a suit against the municipality.[65] Indeed, "'an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity[.]'"[66] Where, like here, both an officer in his official capacity and a municipality are sued, normal practice is to dismiss the official in his official capacity because he is duplicative.[67] Here, Plaintiff's claims against Defendant Officer Capers make no distinction between what is asserted against him in his individual capacity versus in his official capacity. Accordingly, all of Plaintiff's claims against Officer Capers in his official capacity must be dismissed.

## B. Officer Capers is Entitled to Qualified Immunity on All of Plaintiff's Claims

As to Plaintiff's Fourth and Fourteen Amendment claims against Defendant Officer Capers in his individual capacity, those too must fail as Plaintiff's allegations to not rise to the level of any constitutional violation, and any actions taken by Officer Capers were objectively reasonable in light of clearly established law. Therefore, Officer Capers is entitled to qualified immunity.

Officer Capers is presumed to enjoy qualified immunity because abrogation of qualified immunity is the exception, not the rule.[68] Public officials, such as police officers like Officer Capers, acting within the scope of their official duties, are shielded by qualified immunity from claims of

---

[65] *Walker v. Howard*, 517 F. App'x 236, 237-38 (5th Cir. 2013) (citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)).

[66] *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017) (quoting *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985))).

[67] *Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001); *Breland v. Forrest Cty. Sheriff's Dep't*, 2013 U.S. Dist. LEXIS 53503, at *12-13 (S.D. Miss. Apr. 15, 2013).

[68] *Trevino v. Hintz*, 751 Fed. Appx. 551 (5th Cir. 2018); *Foster v. City of Lake Jackson*, 28 F.3d 425, 428 (5th Cir. 1994).

11

civil liability, including Section 1983 claims.[69] Qualified immunity is a viable defense unless the existence of a constitutional violation is "beyond debate."[70] When qualified immunity is claimed, the burden falls on the plaintiff to show it is not applicable.[71]

"'The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[72] Therefore, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."[73] When evaluating a qualified immunity defense, courts conduct a "well-known" two-prong inquiry.[74] Courts have the discretion to "address these two elements in either order, and need not proceed to the second where the first is resolved in the negative."[75] Here, Plaintiff must allege a violation of a constitutional right and then must show that the right was clearly established in light of the specific context of the case in order to overcome the qualified immunity defense.[76] This, Plaintiff has not done and cannot do.

Importantly, if public officials of reasonable competence could differ on the lawfulness of defendant's actions, the defendant is entitled to qualified immunity.[77] "[A]n allegation of malice is

---

[69] *Morris v. Dillard Dept. Stores, Inc.*, 277 F.3d 743, 753 (5th Cir. 2001).

[70] *Ashcroft v. Al-Kidd,* 563 U.S. 731,741(2011).

[71] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

[72] *Mullenix v. Luna*, 577 U.S. 7, 10 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

[73] *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[74] *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 490 (5th Cir. 2001).

[75] *Id.* (citations omitted).

[76] *Thompson v. Mercer,* 762 F.3d 433, 437 (5th Cir. 2014).

[77] *Mullenix v. Luna,* 577 U.S. 7, 10 (2015); *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Fraire v. City of Arlington*, 957 F. 2d 1268, 1273 (5th Cir. 1992).

not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner."[78] The threshold question in applying the two-part test to analyze a claim of qualified immunity is "whether [Plaintiffs'] allegations establish a constitutional violation."[79] If "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."[80] However, "if a violation could be made out, the next sequential step is to ask, whether that right was clearly established."[81] The "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [detective] that his conduct was unlawful in the situation confronted."[82] Here, Plaintiff's federal claims against Officer Capers fail as to both parts of this test and must be dismissed.

### 1. Plaintiff Cannot Establish a Constitutional Violation

In order to state a claim under Section 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[83] Under controlling law, an action by law enforcement must be intentionally - rather than accidentally - directed towards the plaintiff for that action to be deemed violative of the plaintiff's constitutional right to be free from excessive

---

[78] *Malley*, 475 U.S. at 341

[79] *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).

[80] *Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that "order of battle" outlined in Saucier is not mandatory in every instance).

[81] *Saucier*, 533 U.S. at 201.

[82] *Id*. at 202.

[83] *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).

force.[84] "Violation of the Fourth Amendment requires an intentional acquisition of physical control."[85] Indeed, the Fourth Amendment addresses "misuse of power," and "not the accidental effects of otherwise lawful government conduct."[86] **"[T]here is no Fourth Amendment violation in the absence of intentional conduct."**[87] Because Plaintiff's Complaint does not allege any intentional conduct by Officer Capers directed at any Plaintiff, it fails to state a Fourth Amendment claim under Section 1983. Indeed, all of Plaintiff's allegations and the undisputable facts show that the subject shooting was unintentional, which is non-actionable.

The Fifth Circuit has emphasized that in analyzing an excessive force claim under the Fourth Amendment, it is not relevant whether an officer "intentionally shot a bullet" that hit the plaintiff; rather, the ultimate question is whether the officer *intended* to shoot *the plaintiff* specifically.[88] As determined by the Fifth Circuit, if an officer "merely accidentally shot [the plaintiff], then all of the claims fail" because the use of force would not have been unreasonable in the circumstances where it was intended towards a third party."[89] Additionally, the Fifth Circuit noted in *Blair v. City of Dallas* that there could be no Fourth Amendment violation where the officers' conduct is directed appropriately at the suspect but inadvertently injures an innocent person because the means were not

---

[84] *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) (reasoning that law enforcement action cannot be simultaneously unknowing and violative of constitutional rights).

[85] *Id.*

[86] *Id.*

[87] *Gorman v. Sharp*, 892 F.3d 172, 173 (5th Cir. 2018) (emphasis added); *see also, Pearce v. Doe*, 849 F. App'x 472, 475 (5th Cir. 2021); *Bryant v. Gillem*, 965 F.3d 387, 391 (5th Cir. 2020).

[88] *Melvin v. Karman*, 550 F. App'x 218, 219-20 (5th Cir. 2013).

[89] *Id.* at 220.

14

deliberately applied to the victim.[90]

The matter at hand is strikingly similar to the circumstances of *Melvin v. Karman*.[91] At the time of the incident in *Melvin*, the officer discovered an altercation where the decedent was on the ground being attacked by three assailants.[92] The officer drew his gun, approached the assailants, and announced his presence.[93] Two of the assailants fled; the third remained with a gun pointed at the decedent.[94] The third assailant failed to comply with any of the officer's repeated commands to drop his weapon.[95] The officer shot five bullets, four of which struck the assailant, but one bullet hit and killed the decedent.[96] Just like here, the complaint in *Melvin* never alleged that the officer intended to shoot the plaintiff, but only alleged that "[o]ne of the bullets intentionally fired by [the officer] traveled straight into the body of [the plaintiff]."[97]

The Fifth Circuit emphasized in *Melvin* that in analyzing an excessive force claim under the Fourth Amendment, it is not relevant whether an officer "intentionally shot a bullet" that hit (and there, killed) the plaintiff; rather, the ultimate question is whether the officer *intended* to shoot the plaintiff specifically.[98] The Fifth Circuit determined that if the officer "merely accidentally shot [the

---

[90] 666 F. App'x 337, 342 (5th Cir. 2016) (quoting *Milstead v. Kibler*, 243 F.3d 157, 163-64 (4th Cir. 2001) (compiling cases) (other citations omitted).

[91] 550 F. App'x 218, 219 (5th Cir. 2013).

[92] *Id.* at 219.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] 550 F. App'x 218, 219-20 (5th Cir. 2013).

plaintiff], then all of the claims fail because the use of force against [the third-party assailant] in the circumstances would not have been unreasonable."[99]

The Fifth Circuit likewise found no Fourth Amendment violations in *Blair v. City of Dallas*. There, after a brief exchange, officers saw the suspicious individual enter his apartment where, unbeknownst to the officers, a child and another individual were located.[100] The officers had exited their patrol car, unholstered their weapons, and approached the apartment complex when the suspect opened the screen door of his apartment and attempted to step outside while holding a flashlight with a handle resembling a pistol grip.[101] The officers fired multiple shots at the suspect standing in the doorway, thus into the apartment.[102] The innocent bystander and child, in addition to the original suspect, filed suit against the officers and the City of Dallas alleging that the officers subjected them to excessive force and violated their Fourth Amendment rights.[103] The *Blair* Court noted that there could be no Fourth Amendment violation where the victim was accidentally injured by the officers' conduct that was directed appropriately at the suspect because the means were not deliberately applied to the victim.[104] Thus, the Fifth Circuit determined that the officers' use of force was not deliberately applied to the bystander and child as, just like here, there was no evidence that the officers knew the bystander and child were inside the apartment when they fired the shots.[105]

---

[99]  *Id.* at 220.

[100]  666 F. App'x 337, 339 (5th Cir. 2016).

[101]  *Id.*

[102]  *Id.*

[103]  *Id.*

[104]  *Id.* at 342 (quoting  *Milstead v. Kibler*, 243 F.3d 157, 163-64 (4th Cir. 2001) (compiling cases) (other citations omitted).

[105]  *Id.* at 342.

Then, in *Pearce v. Doe*, the Fifth Circuit held that where the allegations amount to no more than a claim of an accidental shooting, there is no constitutional violation that can overcome qualified immunity.[106] In *Pearce*, a kidnaping victim tragically lost his life at the hands of an FBI agent who tried to rescue him.[107] After tracing the victim's location, FBI agents approached the home with their weapons drawn and confirmed that the victim was inside.[108] One agent broke a window during the approach, pointed his gun inside, and when the gun discharged, shot and killed the victim.[109] The Fifth Circuit determined that the only plausible reading of the foregoing allegations was that the agent accidentally shot the victim while trying to help him by ending the hostage situation.[110] Such accidental conduct does not result in a Fourth Amendment violation.[111] The Fifth Circuit additionally stated that "even if arguendo Plaintiff could allege a violation of the Fourth Amendment, . . . , they have not come close to doing so in a way that overcomes [the agent's] qualified immunity."[112]

Similarly, in *Corbitt v. Vickers*, the Eleventh Circuit Court of Appeals held that a mother's 42 U.S.C.S. § 1983 claim against an officer who, while attempting to effect an arrest, made children in the yard lie down on the ground then shot at the family dog, accidentally shooting the mother's son

---

[106] *Pearce v. Doe,* 849 F. App'x 472, 475 (5th Cir. 2021).

[107] *Id.* at 473.

[108] *Id.*

[109] *Id.* at 473-74.

[110] *Id.* at 475.

[111] *Id.* (citing *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989); *Gorman v. Sharp*, 892 F.3d 172, 175 (5th Cir. 2018); *Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (10th Cir. 2000)).

[112] *Id.*

in the knee, was barred by qualified immunity because there was no clearly established law making it apparent to the officer that his actions in firing at the dog and shooting the child would violate the Fourth Amendment.[113] The *Corbitt* Court held "that [the officer's] action of intentionally firing at the dog and unintentionally shooting [the minor] did not violate any clearly established Fourth Amendment rights.[114] Here, just as in *Corbitt*, the minor A.M. "was not the intended target of an active arrest or investigatory stop (in which case the Fourth Amendment clearly would apply), nor was he an arrestee or pretrial detainee (in which case the Fourteenth Amendment clearly would apply);" rather, A.M. just so happened to be in his home "when it became an arrest scene by virtue of circumstances beyond his control."[115]

Such circumstances in this matter make perfectly clear: Defendant Officer Capers did not violate the Plaintiff's clearly established constitutional rights. Officer Webb and Officer Capers had received a call from dispatch to respond to a 911 call for a violent domestic disturbance, which by its very nature posed an unpredictable and volatile situation,[116] involving Nakala Murry and John Nolden at the dark hour of 4 a.m.[117] Dispatch informed the responding officers that the 911 caller was Ms. Murry's mother, who advised dispatch that Ms Murry had been jumped and assaulted by

---

[113] 929 F.3d 1304, 1307 (11th Cir. 2019).

[114] *Id.* at 1315.

[115] *Id.* at 1313.

[116] *United States v. Rodriguez*, 601 F. 3d 402, 408 (5th Cir. 2010); *Mata v. City of Kingsville*, 275 F. App'x 412, 416 (5th Cir. 2008) (citing *Shipp v. McMahon*, 234 F.3d 907, 914 n.5 (5th Cir. 2000), *overruled in part on other grounds by, McClendon v. City of Columbia*, 305 F.3d 323, 328-29 (5th Cir. 2002) (en banc)).

[117] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 1-3; **[Doc. 31-11]** Exhibit "K," IPD Docs. (BS 3-10), Exhibit "A," to Motion to Stay **[Doc. 20]**, at 3.

her boyfriend in the continuing domestic violence situation.[118] At no point were the officers informed that children were present at the scene.[119]

In fact, the 911 caller never stated that children were present in the residence; rather, her statements reasonably conveyed that only two individuals were present in the home: Nakala Murry and John Nolden.[120] Even upon exiting the residence, Ms. Murry never informed Officer Capers nor Officer Webb that any children were present nor that anyone other than the suspect, Nolden, was within the residence.[121] Rather, when Officer Capers asked Ms Murry where the suspect was located, Ms Murry responded with a non-verbal gesture by nodding her head and rolling her eyes at the interior of the residence towards the room on the left behind her, and, moments later, Ms. Murry stated that the suspect was in the back room.[122]

Though the IPD officers did not know children were present, they were aware that the Plaintiff's address had been the scene for dozens of violent, and sometimes armed, disputes between Plaintiff Nakala Murry and John Nolden.[123]  Indeed, IPD officers had been called out to the

---

[118] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 1; **[Doc. 31-11]** Exhibit "K," IPD Docs. (BS 3-10), Exhibit "A," to Motion to Stay **[Doc. 20]**, at 3.

[119] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 3; **[Doc. 31-11]** Exhibit "K," IPD Docs. (BS 3-10), Exhibit "A," to Motion to Stay **[Doc. 20]**, at 3; Answer **[Doc. 19]** at 1, & 3-4.

[120] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-8]** Exhibit "H," Call Reports for 1111 BB King (BS 58-71), at 13; Answer **[Doc. 19]** at 3-4.

[121] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:03:43-0:04:03; Answer **[Doc. 19]** at 3-4.

[122] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at pg. 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:03:42; Answer **[Doc. 19]** at 2.

[123] **[Doc. 31-3]** Exhibit "C," Arrests Reports and Call Log (BS 29-33), at 3; **[Doc. 31-8]** Exhibit "H," Call Reports for 1111 BB King (BS 58-71); **[Doc. 31-12]** Exhibit "L," Prior IPD Incident Reports (BS 34-57), at 7, 16-17, 20-21, & 22-23 (disputes involving Ms. Murry and/or Mr. Nolden where a gun was used); Answer **[Doc. 19]** at 1 & 3-4.

Plaintiff's residence at least fourteen (14) times in the five years preceding the subject incident.[124]

In fact, Officer Capers had previously responded to a 911 call at this address for domestic violence.[125] The suspect, John Nolden, had been arrested numerous times for domestic violence, assault, and other violent offenses.[126]

Officer Webb and Officer Capers only drew their firearms after being informed that Ms. Murry gave consent for them to kick in the door, after dispatch informed them that it was uncertain whether the suspect was armed, and upon hearing Ms. Murry screaming from within the residence, yelling "let me go!"[127] With his flashlight providing the only light inside the residence, Officer Capers only discharged his firearm after a male in a red shirt suddenly ran from the room where Ms. Murry stated that the suspect was located and ran directly towards Officer Capers.[128] It was not until afterwards that Officer Capers learned that anyone other than Ms. Murry and the suspect were located inside the residence and that the individual in the red shirt appeared to be a child.[129]

Thus, when the individual ran directly at Officer Capers from the back room where he had

---

[124] **[Doc. 31-3]** Exhibit "C," Arrests Reports and Call Log (BS 29-33), at pg. 3; **[Doc. 31-8]** Exhibit "H," Call Reports for 1111 BB King (BS 58-71); **[Doc. 31-12]** Exhibit "L," Prior IPD Incident Reports (BS 34-57), at 11-12, 13, 14-15, & 20-21; Answer **[Doc. 19]** at 1.

[125] **[Doc. 31-4]** Exhibit "D," IPD Incident Report for 11-7-20 (BS 81-83); Answer **[Doc. 19]** at 1-2.

[126] **[Doc. 31-9]** Exhibit "I," IPD Arrest Reports Nolden (BS 19-28); **[Doc. 31-10]** Exhibit "J," IPD Municipal Court Abstracts Nolden (BS 15-18); Answer **[Doc. 19]** at 2.

[127] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:02:25, 0:02:42, 0:03:22, 0:03:34, & 0:03:37; Answer **[Doc. 19]** at 2.

[128] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 2 & 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:05-0:04:07; Answer **[Doc. 19]** at 2-3.

[129] **[Doc. 31-2]** Exhibit "B," IPD Incident Report for 5-20-23 (BS 72-75), at 3; **[Doc. 31-5]** Exhibit "E," Body Camera Footage, at 0:04:07-0:04:10 (exclaiming "Oh my God" as he helped the child exit the house); Answer **[Doc. 19]** at 2-3.

been informed the suspect was located, the only reasonable inference in that moment was that the suspect was charging at him, a suspect with a violent criminal history who was engaged in violent criminal activity at that time and had attempted to prevent the victim from exiting the residence. There is no evidence that Officer Capers intended to shoot A.M., and indeed, there is overwhelming evidence that he did not.

Plaintiff's Section 1983 claims amount to allegations that Officer Capers' actions were the result of negligence in failing to use reasonable care in the use of his firearm and in the use of excessive force. Plaintiff never once alleges that Officer Capers *intended* to *shoot* A.M.[130] Rather, Plaintiff alleges that "Defendants, with *reckless disregard* for Plaintiff's rights, **took actions**" that deprived them of their Fourth and Fourteenth Amendment rights,[131] that the "acts of Defendants demonstrate grossly **negligent, oppressive, and reckless conduct**,"[132] and that her theory against the City is that it "is liable for the **negligence** of its employee Officer Capers."[133] None of these allegations suffice.

As stated by this Court in *Baskin v. City of Houston*, "[t]o prevail on Plaintiff's theory the

---

[130] Compl. **[Doc. 1]** at ¶¶ 14 (only alleging that "As Plaintiff A.M. was coming around the corner of the hallway that lead into the living room area, *he was instantly shot* by Defendant Officer Capers."); ¶22 (merely alleging that "Defendants, with *reckless disregard*," "*took actions*" that deprived Plaintiff of their 4th and 14th amendment rights, but never alleging (1) that any such defendant acted intentionally nor (2) that the unidentified, complained of "actions" were intentionally shooting at A.M. purposefully), ¶25 (alleging unidentified actions taken in reckless disregard), 30 (alleging unidentified reckless actions.); ¶32 (alleging that Officer Capers "intentionally, with reckless disregard *and/or negligently* inflicted extreme emotional distress. . . by shooting Plaintiff A.M." but still not alleging that Officer Capers intentionally shot Plaintiff.); ¶33 (clarifying the foregoing allegations of ¶32 by alleging that the acts of Defendants "demonstrate grossly negligent, oppressive, and reckless conduct."); ¶36; ¶48; ¶51 (alleging that the City should be liable for "the negligence of its employee Officer Capers.")

[131] Compl. **[Doc. 1]** at ¶¶ 22 & 25 (emphasis added).

[132] Compl. **[Doc. 1]** at ¶ 33 (emphasis added).

[133] Compl. **[Doc. 1]** at ¶ 51 (emphasis added).

21

shooting violated [her] Fourth Amendment rights, Plaintiff must produce evidence that the shooting was both intentional and unreasonable."[134] As all evidence makes pertinently clear, Officer Capers reasonably reacted to what any reasonable officer would have believed to have been the subject violent offender charging him, and Officer Capers did not discharge his firearm with the intent to shot A.M. In fact, Plaintiff's Complaint does not even claim that the shooting was intentional; rather, the entirety of Plaintiff's claims are crouched in terms of negligence and lack of reasonable care. "*Negligent or accidental conduct by police officers does not rise to the level of a constitutional violation*."[135] Just as in *Melvin*, absolutely nothing suggests that Officer Capers, when facing a potentially armed, violent suspect and reasonably concerned for his own safety the safety of others, took the time deliberately to direct one of his bullets for the purpose of hitting Plaintiff.[136]

Moreover, Plaintiff's Fourth Amendment claims fail as Officer Capers' conduct was neither excessive nor unreasonable. "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: '(1) injury, (2) which resulted directly and only from a use of force that was *clearly* excessive, and (3) the excessiveness of which was *clearly* unreasonable.'"[137] Most importantly, whether a particular use of force was "reasonable" "'must be judged from the

---

[134] *Baskin v. City of Hous*., No. 1:07CV58-SA-JAD, 2008 U.S. Dist. LEXIS 82455, at *7-8 (N.D. Miss. Oct. 16, 2008) *aff'd* 378 F. App'x 417 (5th Cir. 2010) (citing *Brower*, 596-97, 109 S. Ct. 1378).

[135] *Baskin*, 2008 U.S. Dist. LEXIS 82455, at *7-8, *aff'd* 378 F. App'x 417 (5th Cir. 2010) (citing *Brower*, 596-97, 109 S. Ct. 1378) (emphasis added); *see also, McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *Dunn v. Lauderdale Cnty*., No. 3:15CV352 DPJ-FKB, 2015 U.S. Dist. LEXIS 152309, *7 (N.D. Miss. Nov. 10, 2015); *Watson v. Bryant*, 532 F. App'x 453, 457 (5th Cir. 2013).

[136] *Melvin*, 550 Fed. Appx. at 220.

[137] *Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022) (quoting *Trammell v. Fruge,* 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009))) (emphasis added).

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"[138] Thus, the analysis under this objective standard only considers reasonableness "in light of the facts and circumstances confronting [the officer], without regard to [his or her] underlying intent or motivation."[139] The determination of reasonableness "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[140]

Notably,"no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts."[141] Indeed, the Fourth Amendment "does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists."[142] "'Use of deadly force is not unreasonable when an officer would have reason to *believe* that the suspect poses a threat of serious harm to the officer or others.'"[143] Stated differently, "'when the officer reasonably believes that the suspect poses a threat of serious harm[,]'" the "'officer's use of deadly force is not excessive, and thus no constitutional violation occurs[.]'"[144]

"Even where an officer acts negligently and contrary to police procedure," the Fifth Circuit

---

[138] *Trammell,* 868 F.3d at 340 (quoting *Graham*, 490 U.S. at 396).

[139] *Mason v. Lafayette City-Parish Consol. Gov't,* 806 F.3d 268, 275 (5th Cir. 2015).

[140] *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (quoting *Graham*, 490 U.S. at 396-97).

[141] *Watson v. Bryant,* 532 F. App'x 453, 458 (5th Cir. 2013) (quoting *Young v. Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985)).

[142] *Cole v. Carson,* 935 F.3d 444, 468 (5th Cir. 2019) (quoting *Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008) (quoting *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996))).

[143] *Ramirez*, 542 F.3d at 129 (quoting *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)) (emphasis added).

[144] *Batyukova v. Doege,* 994 F.3d 717, 725 (5th Cir. 2021) (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).

has refused "to recognize a constitutional claim where a police officer used deadly force in response to a reasonable belief that an individual posed a threat of serious harm."[145] Importantly, courts carefully avoid "'second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.'"[146] Numerous cases have established that an objectively reasonable officer could believe that a subject suddenly charging at him in the dark posed a threat of serious harm.[147] Importantly, "[l]iability for the officer does not turn on where [the subject] might have planned to run after reaching [the officer]" but instead "turns on objective reasonableness based on what the officer saw."[148]

Officer Capers walked into a volatile situation where he had to make a split-second decision based upon the facts and circumstances known to him at the time. As Officer Capers reasonably believed that only the violent suspect remained inside, and therefore, that the individual charging at him was the suspect. Any reasonable officer in Officer Capers' position would have objectively believed that the suspect with a violent criminal history was charging at him, that the suspect posed a serious threat to the officers as well as the victim through that conduct, and would have reacted similarly. Nothing whatsoever required Officer Capers to wait for the individual charging at him to shoot at him or otherwise attempt to harm him prior to taking preventative action. Accordingly, Officer Capers acted objectively reasonably under the circumstances known to him, and Plaintiff's

---

[145] *Ramirez*, 542 F.3d at 130 (citing *Young v. City of Killeen*, 775 F.2d 1349, 1350-53 (5th Cir. 1985)).

[146] *Batyukova*, 994 F.3d at 725 (quoting *Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019)).

[147] *See e.g., Guerra v. Bellino*, 703 F. App'x 312, 317 (5th Cir. 2017); *Rockwell v. Brown*, 664 F.3d 985, 991-92 (5th Cir. 2011); *Renfroe v. Parker*, No. 3:18-CV-609-DPJ-LRA, 2020 U.S. Dist. LEXIS 200586, at *12-13 (S.D. Miss. Oct. 28, 2020), *aff'd*, No. 20-61101, 2022 U.S. App. LEXIS 6577 (5th Cir. Mar. 15, 2022); *Romero v. City of Grapevine*, 888 F.3d 170, 178 (5th Cir. 2018).

[148] *Guerra v. Bellino*, 703 F. App'x 312, 317 (5th Cir. 2017).

Fourth Amendment claims fail.

Just as Plaintiff's allegations do not, and cannot, rise to the level of a Fourth Amendment violation, Plaintiff's Complaint fails to state a claim under Section 1983 for any Fourteenth Amendment violation. "'[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'"[149] Negligence does not meet the "shock the conscience" standard.[150] Accordingly, "when officers are faced with dangerous situations in which split-second decisions must be made, the bar for demonstrating that certain behavior shocks the conscience is higher."[151]

"Where unforeseen circumstances demand instant judgment," then "even deliberate indifference does not shock the conscience since decisions made in such circumstances are not deliberate."[152] Thus, "[w]here instant judgment is required, only deliberate actions intended to harm another shock the conscience."[153] Plaintiff's Fourteenth Amendment claims, therefore, had to allege that Officer Capers had a purpose to cause harm. However, as Plaintiff repeatedly characterizes Officer Capers' conduct as negligent in nature rather than intentional,[154] Plaintiff's Complaint fails to state either a Fourth or Fourteenth Amendment claim against Officer Capers.

## 2. The Constitutional Violations Alleged Are not Clearly Established.

---

[149] *Baskin,* 2008 U.S. Dist. LEXIS 82455, at *10-11, *aff'd* 378 F. App'x 417 (5th Cir. 2010) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 847, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).

[150] *Id.* (citing *Lewis,* 523 U.S. at 849, 118 S. Ct. 1708).

[151] *Id.* at *11 (citing *Lewis,* 523 U.S. at 853, 118 S. Ct. 1708).

[152] *Id.* at *12 (citing Lewis, 523 U.S. at 851-53, 118 S. Ct. 1708).

[153] *Id.* (citing Lewis, 523 U.S. at 836, 118 S. Ct. 1708).

[154] *See e.g.,* Compl. **[Doc. 1]** at ¶¶ 32-34 (alleging Officer Capers conduct as being "negligent, grossly negligent, and/or reckless in asserting a claim of Civil Assault and Battery), ¶42, and ¶ 51 ("Defendant city is liable for the **negligence** of its employee Officer Capers").

In the case at hand, the Court need not reach this analysis as Plaintiff has failed to meet the first prong of stating any constitutional violation. But, even if this Court were to find that Officer Capers' actions constituted some constitutional violation, which he did not, Plaintiff's claims must still fail because Plaintiff cannot demonstrate an "'existing precedent [that] place[s] the . . . constitutional question[s] *beyond debate*.'"[155] "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[156] This standard is based upon "objective legal reasonableness" and "'ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful.'"[157] Therefore, "'[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'"[158]

"Clearly established law must be particularized to the facts of a case. Thus, while a case need not be directly on point, precedent must still put the underlying question beyond debate."[159] "District courts in this Circuit have been told that 'clearly established law comes from holdings, not dicta.'"[160] Courts "are to pay close attention to the specific context of the case" and not "define clearly established law at a high level of generality."[161] Furthermore, "[c]ases that are 'too factually distinct

---

[155] *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (emphasis in original) (en banc).

[156] *Mullenix v. Luna*, 577 U.S. 7, 10 (2015) (citation omitted).

[157] *Watson v. Bryant,* 532 F. App'x 453, 456 (5th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 244, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (citation omitted).

[158] *Id.* (quoting *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-45, 182 L. Ed. 2d 47 (2012) (internal quotation marks and citations omitted).

[159] *Mullenix*, 577 U.S. at 10 (quotations and citation omitted).

[160] *Jamison v. McClendon*, 476 F. Supp. 3d 386, 416 (S.D. Miss. 2020) (quoting *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019) (citations omitted)).

[161] *Id.* (quoting *Anderson v. Valdez*, 913 F.3d 472, 476 (5th Cir. 2019)).

to speak **clearly** to the **specific circumstances here**' are not enough to deny qualified immunity."[162] In assessing whether the law was clearly established at the time, the court is to consider all relevant legal authority, whether cited by the parties or not.[163] The precise question is "whether a reasonable officer could have believed [his conduct] to be lawful, in light of clearly established law and the information the officer[] possessed."[164]

Moreover, "[i]t is the [Plaintiffs'] burden to find a case in [their] favor that does not define the law at a high level of generality."[165] To meet this high burden, Plaintiff must "point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity."[166] It is simply not enough for Plaintiff to just "show the existence of a genuine dispute on immaterial facts or that a collection of undisputed facts ''imply a speculative scenario that has no factual support.'''"[167]

As demonstrated by Officer Capers' cases in support of the constitutionality of his actions, Plaintiff cannot do this. Indeed, courts have recently determined that such an unintentional shooting would not violate any clearly established law.[168] Moreover, because numerous courts have

---

[162] *Cleveland v. Bell*, 938 F.3d 672, 677 (5th Cir. 2019) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 312, 193 L. Ed. 2d 255 (2015)) (emphasis added).

[163] *Elder v. Holloway*, 510 U.S. 510, 512 (1994).

[164] *Keller v. Fleming*, 952 F.3d 216, 225 (5th Cir. 2020) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)) (cleaned up).

[165] *Jamison*, 476 F. Supp. 3d at 416 (quoting *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019)).

[166] *Id.* (quoting *McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017)).

[167] *Watson*, 532 F. App'x at 456 (quoting *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)).

[168] *See e.g., Corbitt v. Vickers*, 929 F.3d 1304, 1321 (11th Cir. 2019) (looking towards Supreme Court decisions and case law from other circuits in determining that in the accidental shooting context there was no clearly established constitutional violation); *see also, Melvin v. Karman*, 550 F. App'x 218, 219 (5th Cir. 2013); *Blair v. City of Dall.*, 666 F. App'x 337, 342 (5th Cir. 2016).

additionally determined that an objectively reasonable officer could believe that a subject suddenly charging at him in the dark posed a threat of serious harm,[169] a reasonable officer in Officer Capers' position could have believed his conduct to be lawful, in light of clearly established law and the information the officer possessed. As such, Officer Capers is entitled to qualified immunity, and Plaintiff's claims against Officer Capers must be dismissed.

## V. CONCLUSION

For the reasons stated hereinabove and in his Motion for Judgment on the Pleadings, Officer Greg Capers respectfully requests this Court dismiss all of Plaintiff's federal law claims under *Fed. R. Civ. P.* Rule 12(c).

**RESPECTFULLY SUBMITTED** this the 10th day of November, 2023.

**JACKS GRIFFITH LUCIANO, P.A.**

By: /s/ ***M. Mckenzie W. Price***
M. Mckenzie W. Price, MS Bar No. 106538
Daniel J. Griffith, MS Bar No. 8366
Mary McKay Griffith, MS Bar No. 100785
Attorneys for Defendants City of Indianola, Mississippi; Chief Ronald Sampson, in his Individual and Official Capacity; and, Officer Greg Capers, in his Individual and Official Capacity

Of Counsel:

**JACKS GRIFFITH LUCIANO, P.A.**
150 North Sharpe Street
P.O. Box 1209
Cleveland, MS 38732
Phone: (662) 843-6171

---

[169] *See e.g., Guerra*, 703 F. App'x at 317 (per curiam); *Rockwell*, 664 F.3d at 991-92; *Renfroe*, 2020 U.S. Dist. LEXIS 200586, at *12-13 (S.D. Miss. Oct. 28, 2020), *aff'd,* No. 20-61101, 2022 U.S. App. LEXIS 6577 (5th Cir. Mar. 15, 2022); *Romero*, 888 F.3d at 178.

Fax: (662) 843-6176
Email: mprice@jlpalaw.com
      dgriffith@jlpalaw.com
      mgriffith@jlpalaw.com


Kimberly J. Merchant, Esq.
549 South Washington Ave.
Greenville, MS 38701
Cell: (662) 347-3921
Work: (662) 577-4527
Email: kimjmerchant@gmail.com
City Attorney


## CERTIFICATE OF SERVICE

I, M. Mckenzie W. Price, attorney of record for Defendant, Officer Greg Capers, in his Individual and Official Capacities, do hereby certify that I have this day caused a true and correct copy of the above and foregoing *Officer Greg Capers' Memorandum of Authorities in Support of Motion for Judgment on the Pleadings or in the Alternative, for Summary Judgment, as to Plaintiff's Federal Law Claims* to be delivered by the ECF Filing System to the following:

> Carlos E. Moore, Esq.
> The Cochran Firm - MS Delta
> Email: cmoore@cochranfirm.com
> **Attorney for Plaintiff**

**DATED** this 10th day of November, 2023.

                                        /s/ *M. Mckenzie W. Price*
                                        M. Mckenzie W. Price